**No. 24-5045**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

COURTNEY MCMILLIAN; RONALD COOPER,

*Plaintiffs-Appellants*,

v.

ELON MUSK; X HOLDINGS CORP.;
X CORP., f/k/a/ Twitter, Inc.; DOES,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Northern District of
California, Case No. 3:23-CV-03461-TLT

**BRIEF OF APPELLEES**

MELISSA D. HILL
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: 212.309.6318
melissa.hill@morganlewis.com

SEAN K. MCMAHAN
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Telephone: 214.466.4102
sean.mcmahan@morganlewis.com

JARED R. KILLEEN
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5478
jared.killeen@morganlewis.com

MICHAEL E. KENNEALLY
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave.
Washington, D.C. 20004
Telephone: 202.739.5893
michael.kenneally@morganlewis.com

MARK A. FELLER
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: 415.442.1744
mark.feller@morganlewis.com

*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

X Corp., as successor in interest to Twitter, Inc., certifies that Twitter, Inc. has been merged into X Corp. and no longer exists. X Holdings Corp., as successor in interest to X Holdings I, Inc., certifies that X Holdings I Inc. has been merged into X Holdings Corp. and no longer exists. X Corp. is wholly owned by X Holdings Corp. X Holdings Corp. has no parent corporation, and no publicly held corporation owns 10% or more of X Holdings Corp.'s stock.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES ...................................................................................4

INTRODUCTION ................................................................................................1

STATEMENT OF THE ISSUE..............................................................................5

STATUTORY AUTHORITY .................................................................................5

JURISDICTIONAL STATEMENT .........................................................................5

STATEMENT OF THE CASE...............................................................................6

    I.     Statutory Background........................................................................6

    II.    Factual Background...........................................................................8

    III.   Procedural Background ...................................................................11

SUMMARY OF THE ARGUMENT ......................................................................12

ARGUMENT ....................................................................................................15

    I.     The District Court Correctly Held That Plaintiffs Failed to Plausibly Allege an ERISA Plan..........................................................15

          A.    ERISA Regulates Severance Benefits Only When They Are Provided Through a Benefit Plan....................................15

          B.    The District Court Correctly Determined That Twitter's Alleged Severance Payments Did Not Plausibly Require an Ongoing Administrative Scheme. ......................................19

      1.    The Alleged Payments Were Based on Straightforward Lump Sum Calculations...............................................................................19

      2.    The Amended Complaint Does Not Plausibly Allege a Discretionary Scheme. ............................................................................................23

          C.    Plaintiffs' Criticisms of the District Court Are Meritless.........27

      1.    The District Court Applied the Correct Pleading Standard to Plaintiffs' Claims. .................................................................................27

      2.    The District Court Properly Analyzed Severance Payments at the Time of Plaintiffs' Termination. ...............................................................32

      3.    The District Court Correctly Inferred That the Purported Severance "Plan" Was Discontinued or Modified Before October 2022. ...................35

**TABLE OF CONTENTS**
**(continued)**

Page

4. Plaintiffs Misunderstand *Fort Halifax* and Its Progeny. ....................39

D. The Court Should Reject the Acting Secretary of Labor's Invitation to Disregard Binding Ninth Circuit Precedent. ........40

II. The District Court Correctly Concluded That Amendment of Plaintiffs' ERISA Claims Would Be Futile. ......................................47

CONCLUSION .................................................................................................48

STATEMENT OF RELATED CASES ...............................................................50

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............................51

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Avondale Indus., Inc.*,
    905 F.2d 943 (6th Cir. 1990) ........................................................................37, 38

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004)................................................................................................6

*Aldridge v. Lily-Tulip Inc. Sal. Ret. Plan Benefit*,
    40 F.3d 1202 (11th Cir. 1994) ............................................................................38

*Ashcroft v. Iqbal*,
    556 U.S. 622 (2009)..............................................................................................27

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................27

*Biggers v. Witteck Indus.*,
    4 F.3d 291 (4th Cir. 1993) ...................................................................................37

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003)................................................................................................6

*Bogue v. Ampex Corp.*,
    976 F.2d 1319 (9th Cir. 1992) ......................................................................*passim*

*Delaye v. Agripac, Inc.*,
    39 F.3d 235 (9th Cir. 1994) .........................................................................*passim*

*Edwards v. Lockheed Martin Corp.*,
    954 F. Supp. 2d 1141 (E.D. Wash. 2013)......................................................18, 43

*Fort Halifax Co., Inc. v. Coyne*,
    482 U.S. 1 (1989).........................................................................................*passim*

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
    546 F.3d 639 (9th Cir. 2008) .......................................................................*passim*

4

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
571 U.S. 99 (2013) ................................................................................6

*Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Savs. Program*,
997 F.3d 848 (9th Cir. 2021) ...........................................................33, 35

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................29

*Massachusetts v. Morash*,
490 U.S. 107 (1989) ...............................................................15, 16, 18

*Murphy v. Keystone Steel & Wire Co.*,
61 F.3d 560 (7th Cir. 1995) ............................................................37, 38

*Schobinger v. Twitter, Inc.*,
No. 23-cv-3007 (N.D. Cal.) .............................................................30, 31

*Shwarz v. United States*,
234 F.3d 428 (9th Cir. 2000) ................................................................28

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ................................................................28

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ..............................................................28

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ................................................................28

*Velarde v. PACE Membership Warehouse, Inc.*,
105 F.3d 1313 (9th Cir. 1997) .......................................................*passim*

*Weisbuch v. Cnty. of Los Angeles*,
119 F.3d 778 (9th Cir. 1997) ................................................................29

*Whitfield v. Torch Operating Co.*,
935 F. Supp. 822 (E.D. La. 1996) ..........................................................37

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Winterrowd v. Am. Gen. Annuity Ins. Co.*,
  321 F.3d 933 (9th Cir. 2003) ...............................................................33

**STATUTES**

Employee Retirement Income Security Act
  29 U.S.C. § 1002..............................................................................*passim*
  29 U.S.C. § 1003.........................................................................7, 15
  29 U.S.C. § 1101.................................................................................7
  29 U.S.C. § 1102..............................................................................*passim*
  29 U.S.C. § 1104.................................................................................6
  29 U.S.C. § 1105................................................................................11
  29 U.S.C. § 1132................................................................................11

**OTHER AUTHORITIES**

FED. R. CIV. P. 12 ...............................................................27, 28, 29

**INTRODUCTION**

Plaintiffs are two former Twitter employees who were laid off following Elon Musk's acquisition of the company. Like certain other plaintiffs now pursuing claims against Defendants, they say they are entitled to severance benefits that they supposedly were promised but never received. Unlike those other plaintiffs, however, Plaintiffs do not pursue their claims for severance through state-law causes of action, like breach of contract. Rather, Plaintiffs assert federal claims under the Employee Retirement Income Security Act ("ERISA"). They posit that Twitter maintained a "Twitter Severance Plan," which they characterize as an "employee welfare benefit plan" as defined by ERISA Section 3(1)(A), 29 U.S.C. § 1002(1)(A). And they argue that they—along with a putative class of other terminated Twitter employees—are entitled to severance benefits under the terms of that alleged ERISA plan. The district court concluded that Plaintiffs did not plausibly allege the existence of a plan subject to ERISA and therefore could not sue under that statute. After Plaintiffs disavowed any interest in pursuing severance pay through state law, the district court dismissed their Amended Complaint with prejudice. This Court should affirm.

As the district court correctly held, Plaintiffs failed to plausibly allege the existence of an ERISA plan. Plaintiffs have not identified any plan documents disseminated or made available to Twitter employees that could possibly

1

substantiate the existence of the purported "Twitter Severance Plan." Nor have Plaintiffs alleged any written or oral communications to Twitter employees describing the terms of the supposed benefit plan. They also identify no Form 5500 filings, which ERISA plans are obligated to file with the Department of Labor, to support the existence of such a plan.

Unable to point to any of the usual signs of an ERISA plan, Plaintiffs rest their case on a "Severance Matrix" that they admit was never provided to Twitter employees, that is confidential and protected by attorney-client privilege, and that Plaintiff McMillian improperly took with her when she left Twitter.[1] Plaintiffs claim that this document "memorialized" the terms of the purported plan, and they then string together a handful of communications to Twitter employees immediately before the acquisition in late 2022 to argue that the company had a longstanding administrative scheme of making severance payments that constituted an ERISA plan under the law. But the communications Plaintiffs highlight *disprove* their attempt at revisionist history. Those communications, at most, describe the general (and somewhat varying) practices regarding severance payments that the company

---

[1] Plaintiffs filed the matrix as an exhibit to the original complaint but, at Defendants' insistence that the document was privileged, agreed to remove it from the public docket via sealing, although disputing the privilege claim. Their Amended Complaint continues to cite the matrix, which Defendants believe is improper because McMillian was not authorized to take that document when she left Twitter, whether privileged or not. But that issue is not before this Court.

took in 2019-2022, and specifically the severance that Twitter might offer employees whose positions were eliminated and who executed a separation agreement in 2022 before Musk's acquisition of Twitter. That potential severance package consisted of *a single lump-sum cash payment* comprising two months' salary, bonus, cash value of equity, and a cash contribution for healthcare.

Under governing Supreme Court and Ninth Circuit precedent, Plaintiffs' allegations that Twitter offered lump-sum cash payments to terminated employees do not plausibly bring that severance pay within the scope of ERISA. The Supreme Court has held a "plan" subject to ERISA exists only where benefit payments require an "ongoing administrative program," including, among other things, determining claimant eligibility, calculating benefit levels, processing claims, and paying benefits. *Fort Halifax Co., Inc. v. Coyne*, 482 U.S. 1, 12-15 (1989). On the other hand, "a straightforward computation of a one-time [severance payment] obligation" does not implicate the type of "ongoing administrative scheme" that would be subject to ERISA. *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994); *accord Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997). The district court concluded that it was reasonable to infer from the allegations in the Amended Complaint that Plaintiffs claim entitlement only to "a one-time payment . . . requiring little need for ongoing oversight or continuing qualification analyses." ER-22. Because Plaintiffs' own pleading alleged that Twitter's

3

severance payments required no "ongoing administrative scheme," the district court had no basis for inferring the existence of an ERISA-governed plan.

The district court also concluded Plaintiffs alleged no facts showing Twitter exercised more than a modicum of discretion in calculating and issuing severance payments. ER-21–23. This Court has held that "discretionary decision-making" is "the hallmark of an ERISA plan." *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1322 (9th Cir. 1992). In ruling the Amended Complaint did not allege sufficient discretion to suggest an ERISA plan, the court relied on Plaintiffs' allegations that the alleged severance program required no particularized discretion regarding benefit calculations, further undermining any inference that an ERISA plan existed.

Finally, the district court held that any Twitter severance "plan" that may have existed at some point in the past "was discontinued or modified greatly" in conjunction with Defendant Musk's acquisition of Twitter in October 2022, as reflected in the pre-acquisition communications incorporated into Plaintiffs' Amended Complaint. ER-26. Therefore, Plaintiffs (and other Twitter employees terminated on or after Defendant Musk acquired the company on October 27, 2022) would not have had claims under any "earlier plan" that Plaintiffs postulate and could not bring claims seeking benefits under any such plan. Again, the court's conclusion was founded on Plaintiffs' own allegations about the pre-acquisition communications, which make no mention of the eligibility factors that Plaintiffs

argue were components of the alleged plan and required discretion and creation of an administrative scheme. The district court thus reasonably concluded that no such components existed in the period following the acquisition.

In short, the district court correctly concluded that Plaintiffs' allegations and binding Ninth Circuit precedent preclude their contention that Twitter offered a severance "plan" within the scope of ERISA. This Court should affirm.

## STATEMENT OF THE ISSUE

Whether the district court correctly determined that Plaintiffs' Amended Complaint and the documents incorporated therein do not plausibly allege the existence of an ERISA-governed plan providing severance benefits to Twitter employees terminated after October 27, 2022.

## STATUTORY AUTHORITY

Defendant-Appellees agree with and incorporate by reference Plaintiffs-Appellants' Addendum of Statutory Authority.

## JURISDICTIONAL STATEMENT

Defendant-Appellees agree with and incorporate by reference Plaintiffs-Appellants' Jurisdictional Statement. *See* Br. at 12.

5

## STATEMENT OF THE CASE

### I. Statutory Background

ERISA is "a comprehensive statute for the regulation of employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). It reflects a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Id.* at 215 (citation omitted).

One crucial part of Congress's balancing of these competing aims was to place the "plan . . . at the center of ERISA." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (citation omitted). "[N]othing in ERISA requires employers to establish employee benefits plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) (citation omitted). "Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." *Id.* (citation omitted). On the contrary, "employers have large leeway to design . . . welfare plans as they see fit." *Id.* And then once a plan is established, the written terms of the plan document generally control the parties' rights and obligations. *Heimeshoff*, 571 U.S. at 108; *see* 29 U.S.C. §§ 1102(a)(1), 1104(a)(1)(D). "This focus on the written terms of the plan is the linchpin of 'a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" *Heimeshoff*, 571 U.S. at 108 (citation omitted).

6

In keeping with the statute's plan-centered design, ERISA's coverage is limited to "employee benefit plan[s]." 29 U.S.C. § 1003(a); *see also* 29 U.S.C. § 1101(a). Employee benefit plans come in two varieties: welfare benefit plans and pension benefit plans. 29 U.S.C. § 1002(3); *see* 29 U.S.C. § 1002(1)-(2). The relevant variety here, a welfare plan, is defined as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries." 29 U.S.C. § 1002(1).

The Supreme Court has characterized the statute as defining these terms "tautologically," and therefore has drawn a distinction between merely offering benefits and offering benefit *plans*. *Fort Halifax*, 482 U.S. at 8, 11. A benefit plan is marked by "an ongoing administrative scheme." *Id.* at 18. "Some severance benefit obligations by their nature necessitate an ongoing administrative scheme, but others do not." *Id.*

In addition, an ERISA plan requires a fiduciary. 29 U.S.C. § 1102(a)(2). ERISA fiduciaries are defined by their exercise of discretion in the management or administration of the plan. 29 U.S.C. § 1002(21)(A). Consistent with these statutory provisions, this Court has characterized "discretionary decision-making by the plan's administrator" as "the hallmark of an ERISA plan." *Bogue*, 976 F.2d at 1322.

7

## II.    Factual Background

Plaintiffs' Amended Complaint seeks additional severance benefits that they allege Defendants "promised and were obligated to provide" to a putative class of former Twitter employees laid off in 2022 and 2023, after Defendant Musk acquired Twitter.  ER-48 ¶ 4, ER-59 ¶ 82.  According to the Amended Complaint, Twitter maintained an ERISA-governed severance plan for employees since at least 2019.  ER-51 ¶ 27.  They allege that an employee's eligibility for severance under the alleged ERISA plan and "the amount and type of severance" were set forth in a "Severance Matrix" and depended "on several factors, including the reason for the departure, an employee's tenure at the company, job level, department, restricted stock unit (RSU) issuance and price of RSUs at the time of departure, whether the employee's departure entailed any legal risk for the company, and other factors."  ER-51 ¶ 29, ER-52 ¶¶ 33–34.  The Amended Complaint never identifies these "other factors." *See generally* ER-47–70.  Plaintiffs contend the "types of benefits included [those] payments . . . ; a payment for health insurance continuation; pro-rated bonuses for certain types of employees; payments for RSUs; and outplacement services."  ER-52 ¶ 30.

Plaintiffs do not identify any formal plan documents, such as summary plan descriptions, or any other communications disseminated to Twitter employees before the announcement of Musk's proposed acquisition to support their contention

8

that Twitter established an ERISA plan in 2019. *See generally* ER-47–70. In fact, Plaintiffs argued to the district court that Twitter "*kept the Plan largely secret* until the day" the proposed acquisition was announced. SER-40, 47.

In April 2022, Twitter and Musk announced they had entered into an agreement for Musk to purchase Twitter. ER-53 ¶ 40. Plaintiffs contend that following this announcement, employees made numerous inquiries of the company's human resources department, asking "what benefits they would be eligible for in the event of their separation from the Company." ER-36 ¶ 12.[2] Plaintiffs allege that the human resources department addressed those inquiries through a set of communications (the "Acquisition FAQs"). ER-54 ¶ 44. Among other things, the Acquisition FAQs purportedly summarize severance benefits Twitter provided before October 27, 2022, when Musk acquired the company. ER-28 (alleging "[a] summary of the Severance Matrix was provided to employees in a May 2022 e-mail and in May 2022 and October 2022 entries in 'Twitter Acquisition:

---

[2] After briefing on Defendants' motion to dismiss and before its ruling, the district court issued a "Notice of Questions" ordering the parties to answer eight questions arising from the briefing. ER-38–40. One of the questions asked Plaintiffs to identify the "effective date" of the purported plan documents. ER-38 Question No. 1. Plaintiffs answered that the "plan" dates to 2019 and was "memorialized" in the matrix. ER-28. Plaintiffs also averred that a "summary" of the matrix was provided to employees in the pre-acquisition communications issued in 2022 and submitted a declaration from Plaintiff McMillian that attached some of those communications. ER-27–29; ER-34–37. The district court considered these materials in its opinion granting Defendants' Motion to Dismiss and Plaintiffs submitted them as part of their appeal.

Tweep FAQs'"). Plaintiffs assert that these communications included "further details about and promises to continue Twitter's Severance Plan." ER-54 ¶ 46.

Notably, Plaintiffs' allegations about the terms of the alleged 2019 severance "plan" conflict with *their own allegations* about the severance "plan" that the Acquisition FAQs purportedly summarized for employees in 2022. These communications identified a far more limited set of factors used to mechanically calculate a lump sum severance payment for a given employee, and make no mention of outplacement services. Specifically, the October 24, 2022, Acquisition FAQ update stated:

> Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least: two months base salary . . . ; pro-rated Performance Bonus Plan compensation at target; cash value of equity that would have vested within three months from the separation date; [and] a cash contribution for health care continuation.

ER-54–55 ¶ 49, SER-18-19.

Three days later, on October 27, 2022, Defendant Musk acquired ownership of Twitter. ER-49 ¶ 9. Plaintiffs allege that beginning in November 2022, Twitter engaged in a reduction of its workforce as part of a strategic reorganization to improve the health of the company. ER-55 ¶ 55. On November 4, 2022, Twitter notified some employees that they were being discharged as part of a reduction in force and that their last day of employment with Twitter would be January 4, 2023.

10

ER-57 ¶ 66. In addition to receiving at least 60 days paid non-working time between the date they were notified of the layoff and their termination date, consistent with federal and state WARN acts, these individuals were promised additional severance equivalent to one month's pay. *See* ER-58 ¶ 72. Following the initial rounds of layoffs, additional employees were let go and offered similar severance benefits. ER-57 ¶¶ 67–69. Plaintiffs were offered similar severance benefits upon the termination of their employment. ER-58 ¶¶ 77, 79.

## III.    Procedural Background

The Amended Complaint asserts four causes of action based on Plaintiffs' overarching theory that ERISA obligated Defendants to make additional severance payments: (1) a denial-of-benefits claim under 29 U.S.C. § 1132(a)(1)(B) for failure to pay severance benefits in accordance with the terms of the alleged ERISA plan (Count I); (2) a breach-of-fiduciary duty claim under 29 U.S.C. § 1132(a)(2) for failure to fund the alleged plan (Count II); (3) a claim for equitable relief based on Defendants' alleged failure to disclose information about Twitter's severance packages under 29 U.S.C. § 1132(a)(3) (Count III), and (4) a claim under 29 U.S.C. § 1105(a) and § 1132(a)(3) for failure to monitor the alleged plan's fiduciaries (Count IV). ER-61–67 ¶¶ 89–140.

On January 9, 2024, Defendants moved to dismiss the Amended Complaint. SER-62-86. Defendants argued that Plaintiffs failed to allege that Twitter's

severance payments constituted an ERISA plan under controlling law. On July 9, 2024, the district court entered an order granting Defendants' motion to dismiss. ER-4–26. The court held that Plaintiffs failed to plausibly allege that Twitter's severance program constituted an ERISA plan for several mutually reinforcing reasons. The court gave Plaintiffs an opportunity to replace their futile ERISA claims with state law claims. ER-26.[3] But Plaintiffs elected to stand on their complaint and pursue this appeal instead. ER-3.

## SUMMARY OF THE ARGUMENT

Plaintiffs' claims for severance benefits under ERISA turn entirely on the question of whether the Amended Complaint plausibly alleges Twitter maintained an ERISA-governed severance plan. In dismissing the Amended Complaint, the district court correctly held that Plaintiffs failed to plausibly allege such a plan existed. The court's conclusions are based squarely on Plaintiffs' own allegations and governing Ninth Circuit law that sets forth the requirements for pleading the existence of an ERISA severance plan.

As the Supreme Court and this Court have recognized, ERISA does not govern all severance benefits offered by an employer, but only those benefits that

---

[3] Specifically, the court invited Plaintiffs to file "a sufficient complaint (stating non-ERISA claims for breach of contract, promissory estoppel, etc.)," and agreed to "consider issuing an Order finding this case related to one of the cases currently pending. . ." ER-26 (Order at 23); *see also* ER-5 (Order at 2 n.2) (collecting cases).

amount to a "plan." Although ERISA does not define the term "plan" in any detail, this Court has held a plan exists where the payment of benefits necessitates an ongoing administrative scheme. A traditional severance package, which calls for nothing more than a one-time, lump-sum payment, generally does not satisfy the requirement of an ongoing administrative scheme.

The district court concluded Plaintiffs did not plausibly allege the existence of an ERISA plan under controlling precedent. Specifically, the court held Plaintiffs did not adequately plead that (i) Twitter's severance practices required an ongoing administrative scheme, or (ii) Twitter's severance practices involved anything more than rote application of benefit calculations. Those conclusions were firmly rooted in Plaintiffs' own allegations about Twitter's severance practices. The Amended Complaint relies on the Acquisition FAQs, which Plaintiffs say summarized the terms of the alleged severance plan. As the district court observed, the Acquisition FAQs indicate that, generally speaking, in the event of a position elimination as of October 24, 2022, the company's severance package included a single lump-sum cash amount based on a specific set of uniform factors. The district court properly relied on the Acquisition FAQs to conclude that Twitter's alleged lump-sum severance did not require an ongoing administrative scheme that would indicate the existence of an ERISA plan.

13

Plaintiffs do not meaningfully address the district court's findings. In fact, they barely mention the Acquisition FAQs at all, even though they incorporated that document into their Amended Complaint and it confirms on its face that Twitter did not administer an ERISA severance plan. At most, Plaintiffs attempt to distinguish the Ninth Circuit law the district court relied on in dismissing the Amended Complaint. But Plaintiffs cannot escape controlling precedent. As explained below, this Court has held the payment of a lump-sum cash amount does not support an inference that an employer maintained an ERISA plan. That is all the Amended Complaint alleges, and therefore dismissal was entirely appropriate.

Plaintiffs' other criticisms of the district court's decision also fall flat. Plaintiffs contend the court applied a heightened pleading standard and incorrectly drew inferences against Plaintiffs. The district court did no such thing. Instead, it relied on the Amended Complaint and documents incorporated therein to conclude that Plaintiffs failed to allege the existence of an ERISA severance plan. Indeed, the court drew the only logical inference possible based on Plaintiffs' repeated contention that the Acquisition FAQs provided to Twitter employees were summaries of the "plan" along with the content of those communications themselves. Nor did the court reach this conclusion based on allegations made by other plaintiffs in different lawsuits seeking benefits from Twitter, as Plaintiffs suggest. The district court merely noted its conclusions were consistent with

14

conclusions reached by other courts that have considered similar allegations. Moreover, Plaintiffs' argument that the court inappropriately assumed that the alleged Twitter plan was "amended" upon Defendant Musk's acquisition of the company overstates the district court's finding and ignores the very record before the court. Finally, the district court correctly concluded that amendment would be futile.

**ARGUMENT**

**I.      The District Court Correctly Held That Plaintiffs Failed to Plausibly Allege an ERISA Plan.**

**A.      ERISA Regulates Severance Benefits Only When They Are Provided Through a Benefit Plan.**

It is well settled that ERISA does not govern every severance-benefit package that an employer might offer in the event of termination. As Supreme Court and Ninth Circuit precedent both recognize, ERISA pertains to severance benefit *plans*, rather than severance *benefits* as such. *See*, *e.g.*, *Fort Halifax,* 482 U.S. at 12; *Delaye*, 39 F.3d at 237. By its terms, ERISA is written to cover "employee benefit plan[s]," 29 U.S.C. § 1003(a), which comprise both employee welfare benefit plans and employee pension benefit plans. 29 U.S.C. § 1002(3); *see, e.g.*, *Massachusetts v. Morash*, 490 U.S. 107, 113 (1989). Sometimes, "[p]rovisions for severance pay may constitute an employee welfare benefit plan within the meaning of ERISA"— but not always. *Delaye*, 39 F.3d at 237. And when they do not, ERISA provides no

15

basis for relief, and plaintiffs must look to state law, such as contract law, to obtain relief. *Id.* at 238.

The statute defines an employee-benefit plan in terms of a "plan, fund, or program," but it does not further explain what constitutes a "plan, fund, or program" in the relevant sense. 29 U.S.C. § 1002(1)–(2); *Morash*, 490 U.S. at 114. As a result, the Supreme Court has observed that "the terms 'employee benefit plan' and 'plan' are defined only tautologically in the statute." *Fort Halifax*, 482 U.S. at 8. The Supreme Court and this Court have therefore identified the characteristics of a benefit plan by considering the purposes and background of ERISA. *See id.* at 9.

To start, a benefit "plan"—as distinct from a mere benefit or simple payroll practice—necessarily "presumes that some type of *administrative activity* is taking place." *Id.* at 15 (emphasis added). An ERISA plan therefore may be said to exist where there is an "ongoing administrative program for processing claims and paying benefits." *Id.* at 12. An employer that "makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Id.* at 9. "The most efficient way to meet these responsibilities is to establish a uniform administrative scheme,

16

which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Id.*

This Court has had several occasions to flesh out *Fort Halifax*'s concept of an ongoing administrative scheme. First, in *Bogue*, the Court explained that "the fence between cases involving real ERISA plans" and cases that do not "looks to whether the plan in question requires an administrative scheme because the circumstances of each employee's termination have to be analyzed in light of certain criteria." 976 F.2d at 1323 (citation, quotation marks, and brackets omitted). Thus, the ongoing-administrative-scheme requirement is satisfied where "the program's administration require[s] a case-by-case, discretionary application of its terms." *Id.* In *Delaye*, however, the Court clarified that the requirement is not met by "a straightforward computation of a one-time obligation." 39 F.3d at 237. Likewise, in *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997), the Court reaffirmed *Delaye*'s conclusion that having "to make a single arithmetical calculation to determine the amount of the severance benefits" does not give rise to an ongoing administrative scheme.

*Fort Halifax* itself supports this Court's determination that severance payments typically do not require an "ongoing administrative scheme":

> The requirement of a one-time lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on

17

a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.

482 U.S. at 12. Thus, "[t]raditional severance packages, which call for nothing more than a one-time, lump-sum payment, generally do not satisfy the requirement" of an ongoing administrative scheme. *Edwards v. Lockheed Martin Corp.*, 954 F. Supp. 2d 1141, 1149 (E.D. Wash. 2013), *aff'd* 617 F. App'x 648 (9th Cir. 2015). By contrast, "where a plan requires an employer to make eligibility and benefits decisions on an individual case basis—such that there is effectively 'no way to administer the program without an administrative scheme'—the plan will satisfy the ongoing administrative scheme requirement." *Edwards*, 954 F. Supp. 2d at 1148; *accord Bogue*, 976 F.2d at 1323 (severance program that "required a case-by-case, discretionary application of its terms" to determine eligibility for severance payment was subject to ERISA).[4]

---

[4] The Supreme Court and this Court have also distinguished benefit plans from payroll practices by considering whether the payments are made from the employer's general assets or from a dedicated source like a trust fund. *E.g., Morash*, 490 U.S. at 117; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 650 (9th Cir. 2008). Although *Fort Halifax* instructs that employers with ongoing administrative schemes "should not be able to evade the requirements of

Here, the district court concluded that Plaintiffs did not plausibly allege the existence of an ERISA-governed plan for two primary reasons. First, it held that Plaintiffs did not adequately plead that Twitter's severance practices required an ongoing administrative scheme sufficient to constitute an ERISA plan. Second, it held that Plaintiffs did not adequately plead that those severance practices involved enough administrative discretion to indicate the existence of an ERISA plan. Those conclusions were firmly rooted in Supreme Court and Ninth Circuit precedent as well as Plaintiffs' own allegations about Twitter's severance practices at the time of Plaintiffs' termination, and the contrary arguments by Plaintiffs and the Acting Secretary of Labor lack merit.

**B. The District Court Correctly Determined That Twitter's Alleged Severance Payments Did Not Plausibly Require an Ongoing Administrative Scheme.**

**1. The Alleged Payments Were Based on Straightforward Lump Sum Calculations.**

The district court concluded that Plaintiffs did not plausibly allege that Twitter's severance program necessitated an ongoing administrative scheme because, according to Plaintiffs' own allegations, any severance payments to former

---

the statute merely by paying those benefits out of general assets," 482 U.S. at 18, ERISA takes a greater interest in the distinct risks created when an employer establishes a trust for employees' benefit than in arrangements to pay benefits from the same general assets that furnish employees' regular paychecks. *Golden Gate*, 546 F.3d at 650.

Twitter employees would be based on "set calculations" that resulted in "benefits that would be paid to terminated employees in one lump sum and provided at one point in time." ER-17–18. "Twitter paid and offered to pay severance payments based on basic employment criteria that involved mathematical calculations." *Id.*

Specifically, the district court looked to the Twitter Acquisition FAQs, which, according to Plaintiffs' own averments, "summarize[d]" the alleged severance plan's terms. Plaintiffs alleged the Acquisition FAQs were provided to Twitter employees before Defendant Musk's acquisition of the company and described Twitter's "current severance" package as of October 24, 2022. ER-9, ER-20. On their face, the Acquisition FAQs described "a lump sum cash amount" that would include "[t]wo months base salary," "[p]ro-rated Performance Bonus Plan compensation," "[c]ash value of equity that would have vested within three months from the separation date," and a "cash contribution for health care continuation." ER-9, ER-36. The court found it "reasonable to infer" from plaintiffs' allegations that "a one-time payment would be made for all components thereupon requiring little need for ongoing oversight or continuing qualification analyses." ER-22.

Relatedly, the district court correctly concluded that the alleged "outplacement services" did not implicate an ongoing administrative scheme because Plaintiffs alleged that those services were provided by a third-party, not Twitter, meaning Twitter would have no involvement regarding that service. ER-

20

20–21. Moreover, the court again pointed to the Acquisition FAQs, which do not mention "outplacement services," to conclude that "no outplacement services were provided as part of a severance plan for after the October takeover." *Id.* And to the extent the district court needed to consider Plaintiffs' allegations about "outplacement services" at all when they were contradicted by a document incorporated into the Amended Complaint, the court correctly inferred that any "outplacement services" were to be paid as part of the "lump sum cash amount" reflected in the Acquisition FAQs. *Id.*

Rather than confront the Acquisition FAQs—which Plaintiffs' brief never mentions except in a single citation—Plaintiffs attempt to identify superficial factual distinctions in controlling precedent in which this Court found that similar severance payments did not constitute an ERISA plan. For example, Plaintiffs argue that *Delaye* "involved the payment of severance benefits to *only one employee*," and therefore the court's analysis is inapplicable to the situation here. Br. 49. Similarly, Plaintiffs argue *Velarde* "involved a one-time closing of a warehouse, not ongoing terminations over many years," so that "there was no need for an ongoing administrative scheme." *Id.* at 48–49. But Plaintiffs miss the point. The question of whether severance payments require an "ongoing administrative scheme" does not depend on the number of terminated employees, but on the process used by the employer to calculate severance packages and determine eligibility. For example,

21

in *Delaye*, this Court found no ongoing administrative scheme because, as here, the "severance calculation" was "a straightforward computation of a one-time obligation." 39 F.3d at 237. And in *Velarde*, the Court held that an employer's mathematical calculations of severance benefits, like the alleged calculations here, were not "sufficient to turn a severance agreement into an ERISA plan." 105 F.3d at 1317. These cases are dispositive.

*Velarde* is particularly on point. In that case, plaintiffs alleged that the employer promised severance benefits in a "Stay On Letter" to certain employees if they continued to work through a predetermined date on which their warehouse was set to be closed. 105 F.3d at 1315–17. Those allegations mirror Plaintiffs' allegations here that Twitter "promised" in the Acquisition FAQs and other employer communications a certain severance package following the sale of the company on October 27, 2022. The Acquisition FAQs, like the "Stay On Letter" in *Velarde*, described a single lump-sum cash payment based on a handful of inputs. There was nothing discretionary about the timing, amount, or form of the payment purportedly described in the Acquisition FAQs, and, therefore, as in *Velarde*, only a "modicum of discretion" was required in calculating the payment allegedly "promised."

Plaintiffs also rely on *Bogue*, Br. 34–36, but the district court correctly explained why that case bears no similarity to this one. ER-18. In *Bogue*, the

employer was acquired by another company and established a formal severance program—which the employer called the "Special Compensation Program for Designated Key Executives"—to conditionally provide benefits to executive employees if those employees were not offered "substantially equivalent" positions by the buyer. 976 F.2d at 1321. The Court determined that "the program's administrator[] remained obligated to decide whether a complaining employee's job was 'substantially equivalent' to his pre-acquisition job," a "case-by-case, discretionary application" of the program's terms. *Id*. at 1323. This ongoing obligation to apply the program's terms through the exercise of case-by-case discretion was "key" to *Bogue*'s holding, as this Court has subsequently recognized. *See Velarde*, 105 F.3d at 1317; *see also Delaye*, 39 F.3d at 238.

As the district court noted, Plaintiffs make no comparable allegations here; instead, they allege only that Twitter's severance payments were based on "set calculations" and basic employment criteria as reflected in the Acquisition FAQs document cited in the Amended Complaint. ER-16–18. The district court correctly found Plaintiffs' allegations less like those in *Bogue*, and closer to *Delaye* and *Velarde*.

### 2. The Amended Complaint Does Not Plausibly Allege a Discretionary Scheme.

Relatedly, the district court held that Plaintiffs did not plausibly allege the existence of an ERISA-governed Twitter severance plan because the Amended

23

Complaint failed to allege there was "enough ongoing, particularized, administrative, discretionary analysis to make [Twitter's severance payments] an ongoing administrative scheme." *Golden Gate*, 546 F.3d at 651 (citation omitted). This conclusion also was consistent with Ninth Circuit law and the allegations in the Amended Complaint.

Plaintiffs do not dispute that the exercise of discretion is a relevant consideration for severance terms under this Court's precedent. Instead, they argue that they satisfied the "particularized discretion" requirement because "[t]he Twitter Severance Plan included multiple discretionary components." Br. 49. They assert that Twitter determined an employee's eligibility for severance based on "several factors, including the reason for the departure, whether the employee's departure entailed any legal risk for the company, and other factors." *Id.* According to Plaintiffs, the so-called Twitter Severance Plan entailed "substantially more discretion" than the payments at issue in *Fort Halifax*, *Delaye*, *Velarde*, and *Bogue. Id.* at 50.

The district court concluded this argument fails, because the Amended Complaint "does not state sufficient facts to show there was any discretion exercised in eligibility for the severance plan after Twitter's takeover." ER-22. Again, the court relied on the Acquisition FAQs, which allegedly set forth Twitter's "general severance package" as of October 24, 2022 "in the event of a position elimination"

24

after Musk's acquisition. ER-22–23, ER-54 ¶ 49. The court inferred from those allegations and the terms of the Acquisition FAQs that all employees subject to a position elimination "were eligible [for the same severance] regardless of the reason for termination" and therefore that there was no "discretion exercised in disqualification of employees participating in the severance plan since . . . a one-time payment would be made for all components thereupon requiring little need for ongoing oversight or continuing qualification analyses." ER-22. The court also held that it would be reasonable to infer from the Acquisition FAQs that there was no "interpretation of plan terms, or particularized or discretionary analysis needed, since the formulas for calculating severance payments were already set." *Id.*

The district court's holding follows Ninth Circuit law. In *Delaye*, the Ninth Circuit found that the employer's "straightforward computation of a one-time [severance] obligation" involved "nothing discretionary about the timing, amount or form of the payment," even though the obligation depended on whether the termination was with cause or without cause. 39 F.3d at 237. Similarly, in *Velarde*, the Court found no meaningful discretion even though the severance calculation hinged on whether the employee was terminated "for cause." 105 F.3d at 1317. The Court held that although "a 'for cause' termination would change the benefits due to the employee," "this minimal quantum of discretion" was not sufficient to turn the

25

employer's severance practice into an ERISA plan. *Id.*[5] Similarly here, the district court found the alleged calculations in the Acquisition FAQs required little "ongoing particularized discretion" and therefore were insufficient to turn Twitter's severance payments "into an ERISA plan." *Id.* at 1316-17.

Missing from the allegations in the Amended Complaint is any well-pleaded indication that Twitter exercised the type of "discretionary authority" in determining severance eligibility that the employer exercised in *Bogue.* As noted above, the employer in that case was acquired by another company and established a severance program to provide benefits to executive employees who were not offered "substantially equivalent" positions by the buyer. 976 F.2d at 1321. The court found "the program's administrator[] remained obligated to decide whether a complaining employee's job was 'substantially equivalent' to his pre-acquisition job," a "case-by-case, discretionary application" of the program's terms. *Id*. at 1323. Plaintiffs point to no such language in the Acquisition FAQs, nor do they offer any response to this analysis. Instead, Plaintiffs simply ignore the Acquisition FAQs.

---

[5] On appeal, Plaintiffs argue that the district court ignored their allegation that Twitter was required to determine if an employee was terminated for cause. *See, e.g.*, Br. 55. But employees terminated for cause are outside of the scope of the FAQs, which apply in the event of a "position elimination." SER-18. In any event, *Delaye* and *Velarde* establish that even if Twitter needed to make a "for cause" determination, that would not change the outcome.

**C.  Plaintiffs' Criticisms of the District Court Are Meritless.**

**1.  The District Court Applied the Correct Pleading Standard to Plaintiffs' Claims.**

Plaintiffs argue that "[t]he district court repeatedly concluded that the [Amended] Complaint does not plead sufficient facts to establish an ERISA plan, but held Participants to a higher standard than required at the pleading stage." Br. 52. Not so. The district court reached its conclusions by applying the well-settled pleading standards set forth by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 622 (2009). The district court explained a complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails to include "a short and plain statement of the claim showing that the pleader is entitled to relief." ER-14. To survive a motion to dismiss under 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Labels and conclusions" or "formulaic recitation of the elements of a cause of action" do not suffice. *Id.* A court must draw all "reasonable inferences . . . in favor of the non-moving party," but "need not accept as true allegations contradicted by judicially noticeable facts." ER-15.

Plaintiffs point to two specific examples in support of this criticism. Neither point is persuasive.

27

**First**, Plaintiffs assert the court "incorrectly drew inferences" against Plaintiffs with respect to their allegations that Twitter exercised discretion in determining employees' eligibility for severance and incorrectly "inferred that the amount of severance could be determined solely based on formula or mathematical calculations." Br. 55–56. With respect to both the eligibility determination and the calculation of severance components, Plaintiffs contend the court disregarded allegations that Twitter had to evaluate multiple factors, including the reason for the employee's departure, the employee's level and tenure, whether the employee's departure entailed any legal risk for the company, and "other factors." *Id.*

The district court did not substitute Plaintiffs' allegations with its own assumptions, but rather relied on the allegations in the Amended Complaint and documents incorporated therein. Courts may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also* ER-15 (similar). A court need not accept as true on Rule 12(b)(6) review any allegations that contradict documents referred to in the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Rather, "[i]f the pleadings

28

establish facts compelling a decision one way, that is as good as if depositions and other expensively obtained evidence on summary judgment establishes the identical facts." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997). Therefore, when a court deems a document incorporated by reference into a complaint, it may assume its contents are true for the purposes of a motion to dismiss under Rule 12(b)(6). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–03 (9th Cir. 2018).

Here, the district court relied on the allegations in the Amended Complaint and the Acquisition FAQs that were incorporated by reference into the Amended Complaint when it concluded that Plaintiffs could not assert plausible claims. ER-52-53 ¶ 38, ER-54-55 ¶¶ 44–49. Plaintiffs' Amended Complaint alleges that in response to employee inquiries about Twitter's severance policy leading up to Defendant Musk's acquisition of the company, Twitter created the Acquisition FAQs document and distributed the document to employees starting in April 2022 and continuing through October 2022. ER-54 ¶ 44. Plaintiffs stated in another court filing that the Acquisition FAQs provided Twitter employees "a summary" of the terms of Twitter's alleged severance plan. ER-28; *see also* ER-30 (communications to participants in 2022 "purport[ed] to summarize" the severance matrix). Specifically, the Acquisition FAQs stated: "Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash

amount in exchange for signing a separation agreement; the package would include at least: two months base salary . . . ; pro-rated Performance Bonus Plan compensation at target; cash value of equity that would have vested within three months from the separation date; [and] a cash contribution for health care continuation." ER-54 ¶ 49, SER-18-19. Plaintiffs provided a copy of the Acquisition FAQs to the district court and filed a copy of the document on the court's docket in response to the district court's Notice of Questions. SER-17-32. Plaintiffs' attacks on the inferences the district court drew from the allegations set forth in their own pleading thus ring hollow.[6]

**Second**, Plaintiffs argue the district court improperly assumed the truth of allegations contained in another lawsuit, *Schobinger v. Twitter, Inc.*, No. 23-cv-3007 (N.D. Cal.), instead of assuming the truth of the allegations in Plaintiffs' Amended Complaint. Br. 57. Specifically, Plaintiffs contend "[t]he court used the allegations in *Schobinger* to support its inference that 'the bonus component of the severance plan did not require eligibility determinations, was based on a mathematical calculation, and applied to all employees if the company choose[s] to provide bonuses,' which ultimately led to the district court's conclusion that the Plan lacked

---

[6] Plaintiffs argue the district court ignored their allegations about the terms of the 2019 "plan," which in turn rely on the privileged severance matrix, and implicitly fault the court for accepting as true their allegations regarding the Acquisition FAQs. *E.g.*, Br. 44–49. Plaintiffs' Brief hardly even mentions the Acquisition FAQs, referring to them only a single time. *Id.* at 19–20.

discretion and did not require an ongoing administrative scheme." *Id.* at 57–58. But Plaintiffs' argument mischaracterizes the district court's reasoning and exaggerates its reference to *Schobinger*.

To start, the district court did *not* rely on *Schobinger* to determine that the bonus component of Twitter's alleged severance package was non-discretionary. Instead, the court reached that conclusion based on the allegations in the Amended Complaint. For example, the court noted Plaintiffs' allegations that "*all employees are entitled to . . . bonuses,*" ER-20 (citing Am. Compl. ¶ 75) (emphasis added) supported its inference "that the bonus component of the severance plan did not require eligibility determinations." *Id.* Plaintiffs offer no argument as to why the court's conclusions were not sufficiently founded on Plaintiffs' allegations.

Moreover, the district court did not substitute Judge Chhabria's order (or the *Schobinger* allegations) for the allegations in the Amended Complaint, but merely noted that Judge Chhabria's order "does not conflict" with the court's independent finding "that the bonus component of the severance plan did not require eligibility determinations." ER-18–21. In fact, that conclusion was based on "the facts alleged *in the operative complaint*" filed by the Plaintiffs, not anything found in *Schobinger*. ER-20 (emphasis added). The court's observation was immaterial to its decision, and Plaintiffs make much out of nothing. Plaintiffs' mischaracterization of the court's ruling does not support a finding of error.

31

### 2. The District Court Properly Analyzed Severance Payments at the Time of Plaintiffs' Termination.

Plaintiffs also complain that the court focused its assessment on the alleged severance payments made to putative class members after October 27, 2022, rather than to *all* Twitter employees, including employees terminated *before* October 27, 2022. Br. 44. Plaintiffs contend that had the court considered Twitter's severance practices *before* October 2022, it would have reached a different conclusion. Plaintiffs' argument fails.

The only question properly before the district court on Defendants' motion to dismiss the Amended Complaint was whether the Amended Complaint plausibly alleged that the named Plaintiffs are entitled to relief under an ERISA-governed plan. Both named Plaintiffs were terminated after October 2022: Plaintiff McMillian left Twitter on January 4, 2023, and Plaintiff Cooper left Twitter on April 28, 2023. ER-48 ¶¶ 5–6. To answer the question before it, the district court properly assessed whether the Amended Complaint plausibly alleged Twitter maintained a severance plan that required an "ongoing administrative scheme" at the time that Plaintiffs were terminated, i.e. early 2023. The court concluded Plaintiffs failed to plead the existence of an ERISA plan because the alleged severance payments made on or after October 27, 2022, were based on "set calculations" that resulted in "benefits that would be paid to terminated employees in one lump sum and provided at one point in time," and therefore no ongoing administrative scheme was needed

32

to calculate or issue payments made on or after October 27, 2022. ER-17. The court had no occasion to assess whether the alleged severance payments offered to Twitter employees who were terminated *before* October 27, 2022, necessitated an "ongoing administrative scheme" because that question fell outside the scope of Plaintiffs' claims.

For this reason, Plaintiffs' allegations about the "plan" purportedly established in 2019 and memorialized in the privileged matrix were irrelevant to the question of whether the severance program allegedly reflected in the FAQs leading up to the acquisition and supposedly continuing afterward constituted an ERISA welfare benefit plan. Plaintiffs did not plausibly allege the severance program offered in conjunction with *their* termination constituted an ERISA plan, resulting in dismissal. *E.g.*, ER-17–18.

Plaintiffs' criticism also fails for a separate reason. They acknowledge that this Court has adopted the "reasonably ascertainable test," which confines ERISA to benefit plans that "enable reasonable persons to 'ascertain the intended benefits, beneficiaries, source of funding, and procedures for receiving benefits.'" Br. 63 (quoting *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 939 (9th Cir. 2003)); *see also Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Savs. Program*, 997 F.3d 848, 859 (9th Cir. 2021) (explaining that an ERISA plan is established "if from the surrounding circumstances a reasonable person can ascertain

33

[1] the intended benefits, [2] a class of beneficiaries, [3] the source of financing, and [4] procedures for receiving benefits" and these factors are "a benchmark for assessing whether a de facto plan is an ERISA plan" (citation omitted)). In other words, Plaintiffs concede (as they must) that the district court was right to assess Twitter's alleged severance payments "from the point of view of individual employees" as required by controlling Ninth Circuit precedent. The court assessed Twitter's severance payments from the perspective of Twitter employees *after* the announcement that Musk would take control of the company in October 2022. The court concluded based on the Amended Complaint that those payments—which were ascertainable only to the extent described in the Acquisition FAQs—did not necessitate an "ongoing administrative scheme," and therefore did not amount to an ERISA plan.

At the same time, there is nothing reasonably ascertainable from a Twitter employee's perspective about the severance program allegedly provided before the Musk acquisition. Plaintiffs allege that program was "memorialized" in the matrix but concede the matrix was never provided to employees. They also argued it was kept "secret" and the severance package was first disclosed in the Acquisition FAQs in 2022. Based on Plaintiffs' own allegations then, there can be no inference that a Twitter employee could "ascertain [1] the intended benefits, [2] a class of beneficiaries, [3] the source of financing, and [4] procedures for receiving benefits"

34

purportedly associated with the matrix when that information was never provided to participants. Instead, the only reasonably ascertainable benefits, if any, were reflected in the Acquisition FAQs, as the district court held. This is a further reason for rejecting Plaintiffs' reliance on the matrix. *E.g.*, *Howard Jarvis*, 997 F.3d at 859 ("As we explained in *Golden Gate*, satisfying the *Donovan* criteria was ***a necessary*** but not sufficient condition for the creation of an ERISA plan.") (quoting 546 F.3d at 652, cleaned up, emphasis added).

### 3. The District Court Correctly Inferred That the Purported Severance "Plan" Was Discontinued or Modified Before October 2022.

In its conclusion, the district court noted that while the "relevant plan" under its analysis is any severance program in effect after October 27, 2022, the same pre-acquisition communications Plaintiffs rely on also showed that such "plan" had been "discontinued or modified greatly." ER-26. Plaintiffs, therefore, also could not state plausible claims with respect to any pre-acquisition plan. Plaintiffs argue this finding was inconsistent with their allegations and "heavily influenced" the decision to dismiss their complaint. Plaintiffs miss the point in several ways.

**First**, the district court did not "refuse to credit" the allegations in Plaintiffs' complaint. Rather, it drew the only logical inference possible based on Plaintiffs' repeated contention that the Acquisition FAQs provided to Twitter employees were summaries of the "plan" along with the content of those communications

35

themselves. For example, Plaintiffs allege that communications from Twitter showed that "from May 2022, the severance components included" two months base salary, bonuses, RSUs and a cash contribution for continued healthcare. ER-55 ¶ 51. Plaintiffs then allege those benefits "are the *same* as the severance package that would result from application of Plan documents such as the Matrix." *Id.* Plaintiffs even suggested to the district court that these Acquisition FAQs acted as *de facto* summary plan descriptions and "set the terms of the plan." ER-28. Plaintiffs cannot now argue that the district court erred by accepting these allegations as true.

Plaintiffs' argument that the district court "looked to Twitter's failure to abide by the plan as evidence that the plan had been amended," Br. 41, finds no support in the record. Plaintiffs cite to the last page of the opinion granting Defendants' motion to dismiss but do not cite any specific language to support their argument. Presumably, Plaintiffs rely on the portion of the opinion stating "communications were made by Defendants showing that the named Plaintiffs would no longer have access to the earlier plan, which was discontinued or modified greatly." ER-26. This, of course, is a reference to the Acquisition FAQs that are central to Plaintiffs' claim, not the later alleged failure to pay benefits due under the purported plan.

**Second**, Plaintiffs argue the district erred in concluding the "plan" was amended because there is no evidence in the record of a formal amendment consistent with written amendment procedures. This argument presumes the

36

existence of a "plan" governed by ERISA, which is precisely the legal issue in dispute. In any event, Plaintiffs' argument is legally flawed.

When no written amendment procedure exists, an ERISA plan sponsor nonetheless can validly amend a plan through a "clear manifestation of an intent to alter the policy or plan."[7] *Biggers v. Witteck Indus.*, 4 F.3d 291, 295-296 (4th Cir. 1993). This requirement is satisfied where the employer communicates plan changes to employees. *See*, *e.g.*, *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 569 (7th Cir. 1995); *Whitfield v. Torch Operating Co.*, 935 F. Supp. 822, 829-830 (E.D. La. 1996) (finding multiple communications to employees validly amended an ERISA plan). For example, in *Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 949 (6th Cir. 1990), the employer had an "unwritten policy of providing salaried employees . . . with severance benefits" that the parties agreed existed. *Id.* at 944. Following a sale of the company, the sponsor promulgated a "Limited Severance Plan" that denied severance benefits to certain salaried employees. The question before the Sixth Circuit was whether the Limited Severance Plan constituted a valid amendment to the "unwritten plan," which lacked formal amendment procedures. *Id.* at 946. The Sixth Circuit concluded that the Limited Severance Plan was a valid

---

[7] Plaintiffs allege in the most conclusory manner that "internal procedures existed for amending the Plan" that "required senior leadership approval and occurred numerous times since 2019." ER-52 ¶ 35. Plaintiffs provide no details regarding these "procedures" and do not contend that the Acquisition FAQs violated those alleged procedures.

amendment to the prior plan and, absent a showing of "any detrimental reliance based on the defendant's failure to comply with § 1102(b) . . . we decline to impose the substantive remedy of prohibiting plan amendment in response to defendant's procedural violations."[8]  *Id.* at 949; *accord Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 569 (7th Cir. 1995); *Aldridge v. Lily-Tulip Inc. Sal. Ret. Plan Benefit*, 40 F.3d 1202, 1211-12 (11th Cir. 1994).

This reasoning applies with equal force to Plaintiffs' argument that the "plan" was not validly amended.  Plaintiffs concede Twitter employees never received any written documents memorializing the purported plan—other than the pre-merger communications that allegedly summarized its terms—and do not point to any written amendment procedures that would have controlled amendment.  In those circumstances, assuming that a "plan" existed within the meaning of ERISA, the pre-merger communications that Plaintiffs argue "set the terms of the plan" effectively amended any plan that might have existed before, as the district court correctly held.

---

[8] Although Plaintiffs allege the "plan" existed since 2019, they do not allege that employees received *any* communications about that "plan" prior to announcement of the merger in 2022. *See generally* ER-47–70.  As a result, they cannot plausibly allege detrimental reliance because the *only* communications they received about the "plan" were the Acquisition FAQs, and Plaintiffs do not allege those were inaccurate.

38

### 4.    Plaintiffs Misunderstand *Fort Halifax* and Its Progeny.

Citing *Fort Halifax*, Plaintiffs further fault the district court for analyzing whether Twitter merely undertook to make one-time payments to terminated employees.  In their view, the "correct question" is whether an employer must make "regular payments" on an ongoing basis.  Br. 47–49.  While the Supreme Court did reason that providing certain benefits might require an ongoing "administrative scheme" if "the employer clearly foresees the need to make regular payments . . . on an ongoing basis," *Fort Halifax*, 482 U.S. at 14 n.9, Plaintiffs ignore the rest of the Supreme Court's discussion on this point.  In analyzing the employer's ongoing administrative scheme for the payment of death benefits, the Court emphasized that those benefits were "included in appellant's retirement plan, with instructions on how eligibility is to be determined, benefit levels calculated, and disbursements made."  *Id.*  Here, in contrast, there are no allegations that Twitter employees received information about eligibility, benefits, or disbursements regarding the "plan" allegedly memorialized in the matrix.  In fact, Plaintiffs concede Twitter *never* provided information about that "plan" because it was kept "secret" from employees.  And as the district court explained, the Amended Complaint and the Acquisition FAQs support the reasonable inference that "there is no need for ongoing payments, claims processing, or other monthly or periodic revisiting of a

39

particular employee's (or individual employee's) payments or benefits processing that could create a fertile ground for abuse or mismanagement." ER-24.

Plaintiffs' expansive reading of the *Fort Halifax* footnote also cannot be reconciled with this Court's holding in *Golden Gate*. There, the Court held that a local ordinance that required certain employers to make payments to a city health care fund on "a regular periodic basis . . . based on the number of hours worked" by each employee did not constitute an ERISA plan. 546 F.3d at 650. The ordinance required covered employers to "maintain accurate records of health care expenditures, required health care expenditures, and proof of such expenditures made each quarter each year." *Id.* at 645. Even so, the Court held that ordinance was not subject to ERISA because "an employer has no responsibility other than to make the required payments for covered employees, and to retain records to show that it has done so." *Id.* at 650. Making those regular payments (and retaining associated records) was not enough to convert the health program into an ERISA plan. Of course, if having to make regular payments were all that is required to turn benefit payments into an ERISA plan, as Plaintiffs argue, then the ordinance in *Golden Gate* would have been subject to ERISA.

### D. The Court Should Reject the Acting Secretary of Labor's Invitation to Disregard Binding Ninth Circuit Precedent.

Unlike Plaintiffs, the Acting Secretary of Labor challenges the district court's decision to assess whether Twitter's severance payments required "particularized

40

discretion." But the "particularized discretion" requirement is well established by this Court's precedent and the law of other circuit courts. In arguing otherwise, the Acting Secretary fails to contend with ERISA's statutory text and the governing case law on this point.

To start, the Acting Secretary asserts "the district court's 'particularized discretion' requirement for ERISA-plan status has no basis in the Act's text," as the statute does not expressly include such a requirement in the definition of a "plan." Brief for the Acting U.S. Secretary of Labor as Amicus Curiae Supporting Plaintiffs-Appellants ("Amicus Br.") at 16 (citing 29 U.S.C. § 1102). That argument fails, however, because the Acting Secretary admits ERISA's statutory text does not provide *any* meaningful definition of a "plan," including a requirement that a "plan" must employ the sort of "administrative scheme" that the Acting Secretary concedes is required. *Id.* at 12, 16. Indeed, the Acting Secretary acknowledges that the "ongoing administrative scheme" requirement that it accepts "stems from" judicial opinion rather than explicitly from ERISA's text, *id.* at 12, yet does not explain why courts may consider a judicially inferred "ongoing administrative scheme" requirement but not a "discretionary decision-making" one. Moreover, the Acting Secretary concedes that 29 U.S.C. § 1102(a)(1), the statutory provision that defines a "plan," essentially "imbue[s] [plan fiduciaries] with discretionary authority," Amicus Br. 12, which suggests that under ERISA "particularized discretion" *is* an

41

important factor in determining the existence of a "plan." After all, a plan needs a fiduciary, 29 U.S.C. § 1102(a)(2), and the defining characteristic of a fiduciary is the exercise of discretion, 29 U.S.C. § 1002(21)(A).

The Acting Secretary also errs in claiming that a "particularized discretion" requirement lacks a basis in this Court's precedent. Amicus Br. 18. She argues that "[w]hile this Court has occasionally referred to 'particularized discretion' in evaluating the ERISA-plan status of severance policies," it "has never deemed 'particularized discretion' an absolute pre-requisite for ERISA-plan status." *Id.* In her view, this Court has applied the "particularized discretion" requirement "only to severance policies that are quite limited in scope and otherwise would *not* qualify as an ERISA plan due to the absence of an ongoing administrative scheme." *Id.* The Acting Secretary thus concedes that this Court's determinations of whether a severance policy qualifies as an ERISA plan has hinged on the "particularized discretion" requirement, but she arbitrarily limits the requirement's application to severance policies that "are quite limited in scope," without any attempt to ground that "scope"-based distinction in the fiduciary context or policies underlying ERISA. *Id.*

The Acting Secretary misreads the relevant precedent. To start, it is misleading to suggest that this Court has only "occasionally" referred to "particularized discretion" in evaluating the ERISA-plan status of severance

42

policies. As the amicus brief shows, this Court has considered "particularized discretion" in *every single decision* on this subject since *Bogue*, where this Court held that "discretionary decision-making" is "the *hallmark* of an ERISA plan." 976 F.2d at 1322 (emphasis added). And because there is "no way to carry out" the sort of administrative scheme required by an ERISA plan without the "discretionary application" of plan terms, this Court has held that an ongoing administrative scheme exists only where "the program's administration required a case-by-case, *discretionary application of its terms*." *Id.* at 1323 (emphasis added). This "discretion" requirement is satisfied where an employer must make decisions on eligibility, award adjustments, interpretation of plan terms, and claims procedures. *Edwards*, 617 F. App'x at 649. "Traditional severance packages, which call for nothing more than a one-time, lump-sum payment, generally do not satisfy the requirement" because they require little exercise of discretion by the employer. *Edwards*, 954 F. Supp. 2d at 1149.

*Golden Gate* reiterated the particularized discretion requirement and indicated that it applies whenever a court is assessing whether ERISA applies to a particular benefit program. The Court explained that the Ninth Circuit has "emphasized that an employer's administrative duties *must involve* the application of more than a modicum of discretion in order for those administrative duties to amount to an ERISA plan." 546 F.3d at 650 (emphasis added). That is because that discretionary

43

decision making is when "an employer has the opportunity to engage in the mismanagement of funds and other abuses," the very issues with "which Congress was concerned when it enacted ERISA." *Id.*

The Acting Secretary tries—but fails—to escape this precedent. First, her brief misreads *Bogue* to suggest this Court looked to "particularized discretion" only *after* concluding that the policy in question "did not have the traditional hallmarks of an ongoing administrative scheme." Amicus Br. 19. That choice of words is curious, because *Bogue* describes "discretionary decision-making" as "the hallmark of an ERISA plan." 976 F.2d at 1322. This Court thus made clear that "particularized discretion" is a primary—rather than a secondary—consideration for assessing the existence of an ERISA plan. Indeed, this Court held an employer's discretionary decision-making is "the fence" that separates "cases involving real ERISA plans and cases like *Fort Halifax,*" which involve non-ERISA severance practices. *Id.* at 1323. That is because "[t]here [is] no way to carry out" an ERISA plan's administrative obligations with "the unthinking, one-time, nondiscretionary application of the plan administrator[] in *Fort Halifax*;" rather, an ERISA plan's "administration require[s] a case-by-case, discretionary application of its terms." *Id.* Contrary to the Secretary's interpretation*, Bogue* leaves no doubt that "particularized discretion" is a necessary factor for finding that a severance practice requires an "ongoing administrative scheme" and thus constitutes an ERISA plan.

44

The Acting Secretary also attempts to distinguish *Delaye* and *Velarde* on the basis that they "did not involve a policy like Twitter's," arguing the Court in those cases resorted to assessing "particularized discretion" only because it was confronted with a policy "that did not pay benefits to multiple employees on an ongoing basis like the Twitter Plan, and thus did not otherwise look like a 'plan' under *Fort Halifax*." Amicus Br. 19–20. But the amicus brief identifies no language in *Delaye* or *Velarde* to suggest this Court decided to supplement its analysis under *Fort Halifax* with an additional "particularized discretion" factor simply because those cases presented a close call. Instead, this Court's consideration of "particularized discretion" in *Delaye* and *Velarde* is consistent with *Bogue,* where the Court called "discretionary decision-making" "the hallmark of an ERISA plan." 976 F.2d at 1322. Further, as explained above, the policies at issue in *Delaye* and *Velarde* are *not* dissimilar to the alleged Twitter severance policy. For example, the "Stay On Letter" in *Velarde* resembles Twitter's Acquisition FAQs, as both documents allegedly "promised" a certain severance package leading up to a single mass-termination event (i.e., the closing of a plant or the purchase of Twitter) and described a single lump-sum cash payment based on a handful of components. There was nothing discretionary about the timing, amount, or form of the payment described in the Twitter Acquisition FAQs or the *Velarde* "Stay On Letter."

The Acting Secretary argues this Court's decision in *Golden Gate* is distinguishable, too. Amicus Br. 21-22. But this argument unaccountably ignores the language stating "an employer's administrative duties must involve the application of more than a modicum of discretion in order for those administrative duties to amount to an ERISA plan." 546 F.3d at 650 (emphasis added). This Court also emphasized that its decisions in *Bogue* and *Velarde* both turned on whether the employer exercised "enough ongoing, particularized, administrative, *discretionary analysis* to make the plan an ongoing administrative scheme." *Id.* at 651 (emphasis added). The Court concluded that the local ordinance at issue in *Golden Gate* was not an ERISA plan because the employer's administrative obligations—which included ongoing payment obligations—"involve mechanical record-keeping, and the employer's payments to the City are typically fixed, due at known times, and do not depend on contingencies outside the employee's control." *Id.* at 651 (omitting citations). The Acting Secretary's attempt to distinguish *Golden Gate* falls flat.

The Acting Secretary also argues that requiring "particularized discretion" would "deprive workers of ERISA's protections merely because their benefits are easy to calculate." Amicus Br. 23–24. This is simply alarmism. The Acting Secretary uses a defined benefit plan as an example, arguing those types of plans use "set formulas" to determine benefits and do not require "particularized discretion." *Id.* at 23. But defined benefit plans are the precise type of plan that ERISA is

46

designed to cover, and have all sorts of protections, like vesting, that do not apply to severance plans, which can be amended or terminated at any time. And it is beyond dispute that many severance benefit programs are not covered by ERISA, so those workers do *not* have ERISA's protections for their severance benefits in any event. *E.g.*, *Delaye*, 39 F.3d at 237-38.

Finally, even if the Acting Secretary were correct and discretion were not a necessary component of an ERISA plan, that would not change the outcome because no "administrative scheme" is necessary to make the rote calculations required to pay a single lump sum to terminated Twitter employees following Musk's acquisition.

## II. The District Court Correctly Concluded That Amendment of Plaintiffs' ERISA Claims Would Be Futile.

Plaintiffs filed two complaints, were given the opportunity to bolster their allegations in response to Notice of Questions issued by the district court, declined the district court's invitation to assert state-law claims, and should not now be permitted to file a third complaint. Although Plaintiffs' Opposition to Defendants' Motion to Dismiss included a conclusory request for leave to amend, they have identified no additional factual allegations that might change the outcome. As the district court explained, the relevant question is whether the severance payments at the time of the acquisition required an ongoing administrative scheme that would render the payments a "plan" within the meaning of ERISA. According to Plaintiffs'

47

own allegations, coupled with the Acquisition FAQs, any post-acquisition severance benefits required a rote calculation that did not entail any discretion or administrative scheme. As a result, Plaintiffs do not and cannot state claims under ERISA.

Relatedly, the district court did not err in concluding that amendment would be futile because of Article III standing concerns. The court simply explained that the "relevant plan is the severance plan that applied" on or after the date of the acquisition, not the plan allegedly in place beginning in 2019. ER-26. That is because Plaintiffs have no personal stake in proving that Twitter employees terminated between 2019 and the acquisition were shortchanged with respect to severance benefits. They can only seek benefits on behalf of individuals who, like them, were terminated after Musk's acquisition of the company in 2022. The terms of the plan purportedly established in 2019 are irrelevant.

## CONCLUSION

Plaintiffs' allegations and the pre-acquisition communications on which they rely permit one conclusion—there is no such thing as an ERISA-governed "Twitter Severance Plan." As a result, Plaintiffs cannot assert claims under ERISA, and the district court correctly dismissed the Amended Complaint without leave to assert amended ERISA claims. This Court should affirm.

Dated:  January 9, 2025

Respectfully submitted,

*s/ Melissa D. Hill*

MELISSA D. HILL
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone:  212.309.6318
melissa.hill@morganlewis.com

SEAN K. MCMAHAN
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
Telephone:  214.466.4102
sean.mcmahan@morganlewis.com

JARED R. KILLEEN
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Telephone:  215.963.5478
jared.killeen@morganlewis.com

MICHAEL E. KENNEALLY
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave.
Washington, D.C. 20004
Telephone:  202.739.5893
michael.kenneally@morganlewis.com

MARK A. FELLER
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone:  415.442.1744
mark.feller@morganlewis.com

*Counsel for Defendants-Appellees*

49

## STATEMENT OF RELATED CASES

In accordance with Ninth Circuit Rule 28-2.6, I hereby state that, to my knowledge, no related cases are currently pending in this Court.

Dated: January 9, 2025                          *s/ Melissa D. Hill*
                                                 MELISSA D. HILL

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-5045

I am the attorney or self-represented party.

**This brief contains 11,198 words,** including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Melissa D. Hill*      **Date** January 9, 2025

51